LIBBY, McNEILL & LIBBY v. JORGENSEN.

(Circuit Court of Appeals, Ninth Circuit. February 10, 1913.)

No. 2,131.

1. SHIPPING (§ 58*)—CHARTERS—LOSS OF VESSEL—LIABILITY OF CHARTERER.
Libelant, as managing owner, chartered a vessel to respondent, a corporation operating a fishing station in Alaska for a voyage from San Francisco to such station and return for a monthly hire for the "bare vessel," respondent to furnish the crew and pay all expenses. The vessel was to be delivered in good seaworthy condition and returned in the same condition in San Francisco, reasonable wear and tear excepted. It was intended she should bring a return cargo of fish at the close of the season. Libelant was hired as master, and the crew were to work as fishermen at the station, and to be paid a stated sum as "run money" for the voyage up and back. The vessel suffered some damage to her masts on the outward voyage, but nothing to affect her practical efficiency. She entered the lagoon on which the station was situated in charge of a pilot furnished by respondent, and was stranded, but not seriously injured. She was floated, anchored at the station, and her cargo discharged in good condition. Respondent's superintendent then ordered all the crew off except libelant, and gave him a notice of cancellation of the charter on the ground of the unfitness of the vessel to carry a return cargo. He afterward had her insufficiently anchored at a different place, and she finally dragged her anchors, and was stranded and lost. There were no men at the place except respondent's employés, and when libelant attempted to hire some of the crew to help take the vessel back, offering a bonus of $150 each, the superintendent refused to settle, and allow them run money on the return trip, and they would not go. Held, that the loss of the vessel was not due to a peril of the sea or an accident of navigation within the exceptions of the charter, but to the fault and negligence of respondent's agents, for which it was responsible as charterer.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244, 314, 327; Dec. Dig. § 58.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. Shipping (§ 53*)--Charters--Construction.

While such charter was a demise of the vessel for the voyage, under which respondent became the owner pro hac vice as to third persons, it remained a charterer as to the general owners, and as between them the acts of negligence of its agents and servants were not attributable to such owners, but to respondent as charterer.

[Ed. Note.—For other cases, see Shipping. Cent. Dig. §§ 214-218, 225; Dec. Dig. § 53.*]

Appeal from District Court of the United States for the First Division of the Northern District of California; R. S. Bean, Judge.

Suit in admiralty by Walter Jorgensen, managing owner of the vessel Jessie Minor, against Libby, McNeill & Libby, a corporation. Decree for libelant, and respondent appeals. Affirmed.

Albert Raymond and L. Oppenheimer, both of San Francisco, Cal., for appellant.

H. W. Hutton, of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. Walter Jorgensen, appellee herein, obtained a decree against the appellant corporation, awarding damages for the loss of the vessel Jessie Minor, and for the expense of his return from Nelson's Lagoon, in Alaska, to San Francisco, Cal. From such decree appeal was taken to this court. The libel filed by Jorgensen set up a certain charter party entered into February 7, 1911, wherein Jorgensen as party of the first part, managing owner of the Jessie Minor, agreed to charter "the whole" of the vessel to Libby, McNeill & Libby, parties of the second part, appellants herein, for a period of five to six months for a voyage from San Francisco to Nelson's Lagoon, Alaska—

"and return to San Francisco (the act of God, perils of the sea, barratry of master and crew, fire, enemies, pirates, piratical thieves, arrest and restraint of princes, rulers and people, collisions, stranding and other accidents of navigation, even when occasioned by the negligence, default or error in judgment of the pilot, master mariners or other servants of the shipowners, always mutually excepted), on the terms following:

"The vessel shall be tight, staunch, strong and in every way fitted and provided for such a voyage.

"Parties of the second part agree to pay to party of the first part for charter of said vessel, at the rate of three hundred and twenty-five dollars ($325.00), U. S. gold coin, per month, for bare vessel, two months (2) charter money to be paid on the date when the vessel is turned over to charterers, and balance at the expiration of the voyage, and when the vessel returns to San Francisco and is discharged.

"Parties of the second part also agree to pay the master's and crew's wages, provisions, towages, wharfage and all and every expense incurred on the voyage, and until said vessel returns to San Francisco, and is discharged and delivered to her owners.

"It is further agreed that parties of the second part may have the said vessel inspected by an approved and competent marine surveyor, and if found that repairs are necessary, to make said vessel safe or put her in proper condition for the aforesaid voyage, the party of the first part will

promptly make such repairs in accordance with the report of said surveyor, and pay the surveyor's charges.

\*       \*       \*       \*       \*       \*       \*       \*       \*

"Movements of vessel to be at discretion of the master.

"In case of wreck, charter money to be paid up to time of wreck only, in such an event, any money paid in advance and in excess of amount due at that time, said amount to be refunded to charterers.

\*       \*       \*       \*       \*'       \*       \*       \*       \*

"Vessel to be delivered to charterers in good seaworthy condition, and to be returned to owners in like good seaworthy condition, reasonable wear and tear excepted."

Jorgensen, as libelant, pleaded performance of .all the conditions of the charter party on his part to be performed, and alleged that, under the terms of the charter party, the appellant took possession at the port of San Francisco, provided the ship with a master and crew, and dispatched her from San Francisco to Nelson's Lagoon, in Alaska, where she arrived June 10, 1911; that when the appellant took possession the vessel was tight, staunch, strong, and seaworthy; that the appellant did not return the vessel to libelant in San Francisco or at any place or at all, but on account of negligently and carelessly anchoring the vessel in Nelson's Lagoon, and by reason of taking the crew of the vessel from on board thereof, and neglecting and refusing to furnish a crew or any man to care for the vessel, and by reason of abandoning her on July 1, 1911, the vessel thereafter, on August 3, 1911, became and was wrecked, and a total loss at said Nelson's Lagoon. Allegations follow to the effect that the appellant paid the charter money agreed upon up to June 1, 1911, but not thereafter, that the ship would have returned to San Francisco about September 17, 1911, except for her loss as aforesaid. It is alleged that Jorgensen was employed by appellant herein to serve as master of the Jessie Minor on the voyage contemplated, and that he served as master, but that, when the ship was lost through the fault of the appellant, appellant refused to return libelant to San Francisco, and he was obliged to pay his own expenses down. Libby, McNeill & Libby, a corporation, denied all liability, denied performance by Jorgensen, denied that the failure to return the vessel was due to any negligence on its part in any way, and denied the value of the vessel to be $8,000 as alleged. It alleged that the libelant was the master, part owner, and managing owner of the Jessie Minor; that about June 10th previous to the arrival of the vessel at Nelson's Lagoon she had lost a mast, and upon arrival at Nelson's Lagoon was stranded upon a sand spit in the lagoon, although at high tide she floated clear on her anchorage; that at the time of the arrival of the vessel at Nelson's Lagoon appellant furnished a competent and experienced pilot to take her into Nelson's Lagoon; that the pilot objected to taking her in at the time, as the tide was low, but libelant directed him to proceed, and that by reason of such instructions by libelant, and because of the neglect and carelessness of libelant the vessel was stranded; that thereafter, about June 27, 1911, the corporation notified libelant that the condition of the vessel was unseaworthy and dangerous, and that she could not carry a return cargo in the condi-

tion in which she then was, and that, unless she was made tight, strong, and seaworthy and put in good condition, appellant could not furnish a return cargo; that libelant refused and neglected to make the vessel tight or seaworthy, or to put her in good condition, although appellant and its agents and employés offered to aid him in every way possible to repair the vessel. It is alleged that all charter moneys due or earned under the charter party have been paid, and that all wages have been paid. The defendant, appellant here, filed a cross-libel, wherein it set up the charter party, and pleaded the neglect and unskillful navigation of libelant as a cause for the damage and unseaworthy condition in which the vessel was when she arrived at Nelson's Lagoon; that libelant refused to make the vessel tight or strong or fit for a return voyage; and that cargo could not be put into the vessel for a return voyage, and that by reason thereof 800 barrels of salmon had to be abandoned at Nelson's Lagoon, to the damage of the cross-libelant in the sum of $10,000.

Testimony was heard, and the District Court found that the vessel was delivered in good seaworthy condition; that after the arrival of the ship at Nelson's Lagoon on June 27, 1911, Libby, McNeill & Libby, the corporation, notified the owner that it canceled the charter party, ordered the mate and crew ashore, and thereafter refused and neglected to care for or protect the vessel, but insufficiently moored her, by reason of which she drifted ashore about August 1st, and was lost. It was also found that it was impossible for the master to obtain a crew with which to bring the ship back to San Francisco, inasmuch as all the available men about Nelson's Lagoon were in the employ of the company; that, while some men were willing at the close of the fishing season to return to the ship in consideration of large bonuses offered by Jorgensen, they could not settle satisfactorily with the company, and for that reason refused to go.

[1] The evidence sustains the findings of the District Court. Jorgensen, the libelant, testified that the vessel was seaworthy when delivered, and up to the time of the last gale of wind, about July 31st, that blew her ashore. It is true that on her voyage up, when about 1,000 miles north of San Francisco, during heavy weather, she lost her mizzen mast, and sprung her foremast. But, notwithstanding these things, she appears to have sailed well, and arrived off Nelson's Lagoon on or about June 10, 1911. Upon her arrival, the company sent a pilot to take her in. Capt. Jorgensen testified that he had never been to Nelson's Lagoon before; that he told the pilot not to go in until the following morning, unless he could take her in safely; that the pilot said there was plenty of water, and started in under a leading wind, but got out of the channel, struck bottom, and "knocked the shoes off of her." Some cargo was removed, and the vessel floated. He testified that she then proceeded to a salting station, and by direction of Mr. Johnson, the superintendent of Libby, McNeill & Libby in Alaska, he moored the vessel in the channel with two anchors out at 30 fathoms on each anchor; that, before the cargo was all discharged, the superintendent ordered the crew to go ashore, leaving Jorgensen and the mate alone on the ship; that afterwards the crew

came aboard, and about June 27th discharged the cargo in lighters; that on June 27th Johnson, superintendent for the company, handed the following letter to him:

"Nelson's Lagoon, Alaska, June 27th, 1911.

"Capt. Jorgensen, Master of Str. Jessie Minor.

"Sir: I hereby notify you, that the charter of Str. 'Jessie Minor' is canceled at this date, the vessel having arrived here in a wrecked condition, her cargo has been discharged more or less damaged, she is therefore unfit to load a return cargo, as the Insurance Co. would object to insure the same.

"Respectfully,                                   Capt. C. A. Johnson,
                        "Superintendent for Libby, McNeill & Libby."

Jorgensen says that he told Johnson that appellant could not abandon the vessel; that it had to deliver in San Francisco; that he asked him for a crew, stating that he would go to San Francisco with her; that there were no men in Nelson's Lagoon other than the employés of the company; that the mate remained for two days, and that he was then taken ashore by the superintendent, Johnson; that thereafter he was left alone on the vessel with provisions for five or six days, the rest of the provisions having been taken ashore by the superintendent; that he remained on the ship about two months; that after June 27th there was a strong wind during which she dragged her anchor; that later Johnson returned to the ship with men and a tug, took her out, and anchored her on the flat, and then announced that "that was the last he would do for the Jessie Minor"; that he had the men bore holes in the back of the casks of water, and left none for Jorgensen to drink; that before the vessel went ashore, about July 31st, he tried to get some men who were up there or who had gone up in the Jessie Minor to go down to San Francisco with him; that the men wanted $150 a month each to take the vessel down, but that the superintendent did not want to settle with them on that basis, and offered them $62.50 each in place of $125 each "run money"; that up to July 31st, or when the ship went ashore, the ship had two masts which could have been put in good condition by a day's work with the crew; that the hull was tight, and that the ship was seaworthy, but that he could get no crew; that about August 2d a heavy gale of wind prevailed, and, although the vessel had usually heavy anchors, they were insufficient, and the ship blew onto a gravel bank, tore off part of her keel, and commenced to leak badly, having two feet of water in the hold; that he then left the ship; that afterwards he saw Johnson, and asked him for passage to San Francisco; that Johnson said he would give it to him, but afterwards wrote him it would be impossible for him to send him down on the schooner Zampa, which belonged to the company, whereupon he (Jorgensen) took a mail boat and reached San Francisco about September 15th. Jorgensen says that, when the superintendent told him he would do nothing more for the ship, she was on the gravel bank high and dry at low water, lying on her side. On cross-examination Jorgensen again said that he asked Johnson to help him to get a crew to take the vessel back to San Francisco; that he could only go among the men there to get a crew, but that he could not get men; that after the

27th of June the ship went onto the beach; that he did all he could to prevent her dragging her anchor, but was alone and quite helpless; that he went ashore finally on the 3d of August; that before he went ashore he hoisted his signal of distress, which attracted the mate and some hunters; that, if he had had men and a place to pull the ship up, he could have repaired her while she was in Nelson's Lagoon; that before she was injured he had tried to get the sailors to take her back; that she was damaged about August 2d, when the false keel broke a piece off, and she commenced to leak badly; that about July 31st Hughes, an employé of appellant, told him to go ashore and try to get a crew, and that he could get a crew, provided he could make arrangements; that after August 3d Hughes wanted him to sell the vessel, but that he told him he would not do it, and that he was going to sue appellant for the loss of the ship; that he offered sailors $150 each to go down, because Johnson told him to offer the men a bounty; that they would have accepted that sum, but thought that the voyage might be dangerous, as Johnson had spoken to them of the danger from the time the vessel arrived, saying that she was not fit to go; that he thought the men wanted the bounty because they might have to do a little more pumping, as the ship had been bumping on the beach for a long time, and was likely to spring a leak if they had bad weather; that after August 3d he made no effort to get men because the ship was a wreck; that he was to get $100 per month as master; that when at Nelson's Lagoon, Johnson wanted to give the men orders on the company for money to take the ship down, but that they would not take such orders, and that that was the reason why he did not get a crew; that the men were engaged, not only as sailors, but as fishermen, too, but that the fishing season ended July 28th. On redirect the witness said that the men signed for $125, but that on July 31st Johnson said that he would not pay them more than $62.50; that thereupon the men said they would not go, as they wanted $125; that the men claimed $125 for the whole run, but that Johnson said he would not pay but $62.50; that the men then said they would not go; that Johnson offered to give them an order on the company for $62.50, but they wanted drafts.

Breamer, a sailor, testified that Capt. Hughes, a pilot sent by Libby, McNeill & Libby, gave orders how to steer the ship in taking her into Nelson's Lagoon; that two or three days after she got inside the lagoon the crew was ordered by Johnson to go ashore; that the cargo was taken off in good condition.

Bardmou, another sailor, said that he had a talk with the mate about bringing the Jessie Minor down; that he was willing to serve for $150, but that Capt. Johnson only wanted to pay him $62.50 because he belonged to the Zampa, another vessel belonging to the same corporation.

Malmstrom, a seaman, testified that he remembered when the ship lost her mizzen topmast and mizzen mast; that she was rolling heavily at the time; that they were reefing the mainsail when the mizzen mast was carried away; that Capt. Hughes, as pilot, took the ship into Nelson's Lagoon, and acted as if he did not know that he was out

of the channel; that the ship struck the bar; that Capt. Johnson ordered the men to go ashore, and afterwards to go to the fishing grounds; that later Jorgensen asked him and others to go and make an arrangement with Johnson, as he wanted a crew to go down, and offered $150 to each man. Witness said he was willing to go, but that Johnson said he could do nothing for them, and that, if they took the Jessie Minor down, they would get no more than $62.50, because the company could not use the vessel for cargo. Witness declined to go for that sum, and afterwards, by direction of Johnson, went down to San Francisco as a passenger on the Zampa.

Harry Hughes, an employé of the appellant corporation, testified that, before taking the Jessie Minor into Nelson's Lagoon, he told Capt. Jorgensen that he had orders from Capt. Johnson, the superintendent, to bring the ship to an anchorage; that Jorgensen would not consent to an anchorage on the outside, but said the ship had to go in; that thereupon witness told Jorgensen that he could not take the responsibility, but that Jorgensen insisted, and they started in about 7 o'clock in the evening. He says the vessel would not come quick enough to the wind, and that she thumped a little on the spit and lost some of her shoe; that the ship would not come to; that the shank of the anchor was broken; that he procured another line and an anchor from Capt. Johnson, and brought them aboard the vessel; that at the next high tide he took the ship into the channel and dropped the anchor, but that the line broke; that he put the ship in a safe and good place in deep water, and had no more to do with her; that on August 1st he went on board and told the captain to try and get men and "get out of this," or he would lose everything, to which the captain replied, "No; if they do not get me out of here, I do not care; I will simply sue Libby, McNeill & Libby for $10,000;" that then he took the captain on shore; that he was aboard between the 4th and 5th, after Jorgensen had said he had abandoned the vessel; that he found some hunters on the ship; that he examined the ship on August 6th, and found she had only lost a shoe; that there were a few scratches which the anchor had made, and a little cement out of a seam; that, when high tide came and the vessel was afloat, she was dry as ever; that the keel was in good condition, although Jorgensen had told him the water was running into her, and that the keel was lying athwartships.

Johnson, the superintendent of the appellant in Alaska, said that, when he handed the letter of cancellation of the charter party to Jorgensen, nothing was said; that on July 1st he asked Jorgensen if he was going to let the vessel stay on the beach, to which he replied no, he wanted to get up the beach where the tide was not so strong; that Jorgensen selected her moorings himself; that he did not see Jorgensen again until about the 1st of August, when he told him that he was willing to assist him in any way he could, with the exception of furnishing men to go aboard the vessel; that he could not do that, but must do it himself; that he would give him such provisions as he could spare; that on the 2d of August he saw the flag hoisted with the Union down, whereupon he sent the mate and the watchman out

to the ship; that afterwards he examined the ship, some time between the 4th and the 8th of August, and found cement loosened in her seams, as she had settled down on the anchor, and had two gashes in the planks about an inch deep; that there were no holes; that the keel was not torn away; that salt had dropped out of the sacks, and was on the floor of the vessel, but that there was no other damage, except to the rigging. Witness was asked whether he had ever asked the captain whether he intended to take the vessel out. He replied:

"Well, I think I put the question to him once, but I could not state the date when I did it. * * * He said that Libby, McNeill & Libby were the responsible parties for his vessel."

Witness said that the captain told him that he had abandoned the ship; that on August 1st he asked the men whether they were willing to go down to San Francisco in the ship; that they had been offered $150 extra run money to take the ship down, and wanted him to pay the full run money up and down; that he said he could not pay it; that it could be settled in San Francisco, providing they were entitled to get it, but that he was willing to pay them the run money $62.50, and wanted them to sign statements substantially to that effect; that the men said they did not want to go in the Jessie Minor, unless they got checks or cash, and that he told them the only thing he could do was to give them an order on Libby, McNeill & Libby, and they could collect it when they got home; that he offered each an order for $62.50, and the other $62.50 could be settled down in San Francisco; that he intended to send fish down in the ship, but that he could not put it on board the vessel in the condition in which she was, as he could not insure the vessel; that there were men at places from 20 to 50 miles away where an effort to get a crew might have been made. On cross-examination the witness said he thought he had canceled the charter when he wrote the letter of June 27th, but that there was nothing so far as the hull was concerned to prevent the ship from being brought back to San Francisco as late as August 8th.

Other witnesses, examined by the appellant corporation, testified to the effect that after August 3d a number of stores and other things were taken from the Jessie Minor over to the shore. Jorgensen, upon being recalled, said that he had no such conversation with Hughes as Hughes had testified to, and that on August 3d, when he abandoned the ship, she could not have been brought back to San Francisco.

Another witness, on redirect, said that it would have been impossible to get the ship out, because she was sunk in the gravel, and there was a hole in her, and that the water ran in at high tide and out again at low tide.

Stangeland, the mate, said that Hughes, the pilot, directed the steering of the ship in, going into the lagoon; that he got out of the channel and ran onto the spit; that they took some cargo off, and then took the ship up the river under orders of Johnson, the superintendent; that she was then anchored in the middle of two anchors, and in a very strong current; that ordinary moorings are insufficient in the current

there; that they lost one anchor when they first went in by the vessel thumping on top of it; that she was finally moored at a place where Johnson directed she should be taken; that he moored her himself; that Johnson told the crew to go ashore, and left only himself and the captain on board; that thereafter the salt was discharged in lighters; that he stayed there until the 27th of June, when Johnson took him ashore, leaving the captain alone; that he tried to get a crew, acting under Jorgensen's orders, offering as high as $150 for men to take the ship down; that he got four men and a cook willing to go, but that, when the men were willing to take $125 run money to take the vessel down, Johnson stopped half of the run money, and only wanted to pay them for taking the vessel up, and that as a result the men would not go; that the men were fishing on a percentage, and it was impossible to get them while they were so occupied; that the vessel was properly anchored until after he left, when Johnson shifted the vessel himself to another place, "away up on the flat"; that there was no reason why the ship should not have gone back to San Francisco if they could have obtained a crew and provisions. This witness explained that the men had shipped for $125 to take the vessel up and down, but that in getting another crew to take her down the captain offered $150, but that Johnson wanted to stop half of the run money going up and down; that the usual contract was $125 for the run going up and returning; and that when they got up, and they were in some danger of the vessel not returning, Johnson offered them $62.50 to pay them off for half the voyage that they had completed—the going part—because he would have to get another crew to return.

The position of appellant is that the lower court erred in its decree awarding the value of the ship because, under the clause (quoted above) in the charter party exempting both parties from liability for loss by peril of the sea and negligence, libelant could not recover, inasmuch as the proximate cause of the loss of the Jessie Minor was by "either a peril of the sea, the gale which drifted the ship on the bank, or a stranding due to the negligence, default, or error in judgment of either the libelant or Johnson, the servant of the appellant, who was owner pro hac vice." With these contentions, however, we cannot agree. Nothing of the loss of the ship is to be attributed to a peril of the sea. The carrying away of the mizzen mast and the springing of the main mast during the voyage northward had no real relation to the things which happened after June 10th, when the ship reached Nelson's Lagoon. The ship was seaworthy when she left San Francisco, and notwithstanding the accidents on her voyage sailed well with two masts, having beaten against the wind for about 3,000 miles. Upon arrival at the lagoon, the charterer, through its superintendent, furnished the pilot. There is some conflict in the testimony concerning the circumstances surrounding the action of the pilot in taking the vessel in, but it is clear that it was under the guidance of the pilot that the ship first ran aground. It is also clear that about June 18th, Johnson, appellant's superintendent, directed the crew to go ashore, and ordered them to discharge the cargo, and later, about June 27th, ordered the mate to go ashore, leaving the master, Jorgensen, alone on

the ship. The letter of notification of the cancellation of the charter was delivered on this same date, June 27th. The statement in the letter to the effect that the cargo had been discharged more or less damaged is in direct opposition to the evidence of the master, who, when asked what condition the cargo was in when taken out of the ship, replied that it was "all right; as good as when it came in. Some of the sacks were broken by handling." On July 1st the superintendent, Johnson, with some men, again anchored the ship, and announced that that was all he wanted to do with her. The circumstances were these: The appellant corporation was in control of the labor situation in and about the lagoon, as there were no men to be had except its employés. Johnson's act in taking the crew away rendered the master practically helpless. The master could get no crew without the aid of the superintendent. The superintendent, however, seems to have acted upon the belief that he could take the crew away, render the master helpless, write that the charter was canceled, and thus relieve the chartering corporation of liability for anything that might happen. But the appellant had contracted to take the vessel back to San Francisco. The fact that Jorgensen, owner, was hired by appellant to serve as master, did not change the relation of the parties to the vessel. As master Jorgensen was subject to the general orders of the appellant. If the superintendent had not been unwilling to make terms with some of the men who were ready to go back with the ship to San Francisco, Jorgensen could have taken her back before August, when she was wrecked; but the superintendent refused to assure them the sum of $125 each, which was the run money they had contracted for before they left San Francisco in April. No sufficient excuse for taking the crew away was offered; nor was it satisfactorily explained why Johnson, superintendent, thwarted the efforts of the master to hire a crew. There was no good reason for detaining the ship at Nelson's Lagoon, and none for allowing her to be wrecked. The decided weight of evidence is that she was not properly anchored when she went ashore about August 1st. It was not an accident of navigation, but an act of negligence in insufficient mooring which caused the ship to drag and go ashore where she was wrecked. Stranding under such conditions cannot be regarded as one of the exemptions from liability for losses.

[2] Our construction of the charter party is that it was one where the mercantile corporation agreed to pay a stipulated price to the shipowner for the use of his whole ship for the voyage by the month, and took the ship and the owner into its service, the corporation to receive the freight actually earned by the ship to its own use, the master and sailors becoming subject to the orders of the merchant, the general management and control being with the merchant corporation. Such a contract was a letting of the vessel with her crew for the voyage specified. Drinkwater et al. v. The Spartan, Fed. Cas. No. 4,085. Ordinarily, and as against third persons in such a case, the charterer becomes the owner pro hac vice, entitled to the rights and subject to the responsibilities which attach to that character; but in a contest with the actual owners for the value of the vessel, under the terms of the charter party, the merchant is not in such relationship to the general

owner. Wilkinson v. Dalferes, 27 La. Ann. 379. It is to be remarked, too, that the terms of the charter party in this case refer to a delivery of the ship to "charterers" and in certain contingencies to amounts to be refunded to "charterers." Appellant itself, by its letter to Jorgensen, dated June 27th, when it elected to cancel the charter as of the date of the letter, recognized that as against it there was a real owner, and that it did not stand as owner pro hac vice, but merely as a charterer. Appellant was under contract to pay the master's and crew's wages, provisions, and all and every expense incurred on the voyage. It could have dismissed Jorgensen as master. Johnson, the superintendent, never was the servant of the shipowner, and never acted in any capacity other than in behalf of appellant. As a consequence what he did is to be attributed to the appellant as charterer, and for the direct results of Johnson's acts appellant is responsible. It follows that when as superintendent he ordered the crew ashore and prevented the master from getting sailors to return with the vessel, and notified the master that the charter was canceled, and anchored the vessel carelessly and then left her, he pursued a course which resulted in a loss for which appellant is liable, as found by the District Court.

Affirmed.